UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DOUGLAS K. YIM,<br>　　Plaintiff,<br>　　v.<br>ROBERT W. FOX,<br>　　Defendant. | Case No. 16-cv-05999-SI<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS**<br>Re: Dkt. No. 1 |

Douglas Yim filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 to challenge his murder conviction. Respondent has filed an answer to the petition, and Yim has filed a traverse. For the reasons discussed below, the court denies the petition.

## BACKGROUND

### I. Procedural History

Following a jury trial in Alameda County Superior Court, Douglas Yim was convicted of first degree murder of Duzy Phan and assault with a firearm and mayhem against Paul Park. Yim was sentenced to, and is presently serving, 75 years to life in prison. Yim appealed to the California Court of Appeal, and his conviction was affirmed on April 28, 2016.[1] The California Supreme Court denied his petition for review on July 27, 2016. He did not file any state habeas petitions.

Yim then filed this action. Yim claims that his trial counsel provided ineffective assistance by failing to object to the admission of prejudicial photographs and testimony regarding other

---

[1] The California Court of Appeal struck an enhancement for great bodily injury, attached to the mayhem count, but otherwise affirmed the judgment of the trial court.

guns not involved in the charged offenses. Respondent has filed an answer, and Yim has filed a traverse.

## II. Trial Evidence

The California Court of Appeal described the facts of this case as follows:

*A. Park's Testimony*

Park went to his friend Yim's house to socialize on the night of April 1, 2011. Park and Yim played video games, smoked marijuana, and drank beer. They were joined by Yim's friend Phan. The three smoked marijuana, and Phan brought over a bottle of Hennessy cognac. Yim and Phan "were pounding [drinks] pretty hard," and snorting cocaine.

While they were playing video games, Yim and Phan began to argue. "[T]here was some smack talking going on while they were playing, and ... it got a little heated." Then they argued about religion. Yim believed in god and Phan did not. They took verbal shots at each other trying to prove their points of view. After arguing for about five to ten minutes, they calmed down and went back to playing games and having fun. About 30 minutes later, Yim and Phan began arguing again. When Yim would lose a game, Phan would taunt him by asking, "Where was god there?" When Phan asked Yim where god was when his father died, Yim threw a video game controller at the TV and broke the screen.

Yim then "got kind of quiet" and had "just a blank expression on his face." Park and Phan cleaned up the broken glass, and tried to calm Yim down. Park offered to pay half the cost of a new TV, and Phan by way of apology offered to pay the other half. In response to these offers, Yim "didn't really say much" and just kind of nodded his head.

Yim went and sat in a dining area off the living room and appeared to calm down. As Park stood between them, Phan spent 15 to 30 minutes telling Yim that he was his friend and that Yim needed to calm down. Yim told Phan, "'You need to leave.'" Phan smiled, gave Yim what Park called a "wake up push" to get his attention, and said, "I'm your fucking friend." Yim gave Phan "a weird like grimace look without saying anything," and Phan said something like "I'm your fucking friend. If you want to get your gun to shoot me, then go ahead." Park did not have the impression that Phan was trying to egg Yim on. Park believed this was Phan's way of apologizing without having to lose face and say he was sorry. For the next five minutes Park stayed between Yim and Phan and tried to calm them down, saying, "'What are you guys talking about? Why

2

are you acting like this?'" He told Phan, "'We should leave.'"

Without saying anything, Yim left the room and walked slowly through the kitchen. When Yim returned to the living room area less than five minutes later his attention seemed focused solely on Phan, and the look in his eyes was "kind of like a blank, kind of pent up rage." Yim was "looking right through" Phan, and Park thought the two were going to fight. Park got in between them, put his hands up and said, "'Hold on.'" Park did not see that Yim was holding a gun. He heard a shot, his left arm "flew back," and for a time he was "blinded and deaf." Then he saw that his left wrist was gushing blood. He noticed that Phan was in a "defensive position," with an arm in front of his face, trying to shield himself from something. Park ran to the front door because he was concerned that he had to get to a hospital before he bled to death. When he got into his car across the street from the house, he heard five or six shots fired one second apart. Although his earlier testimony described a shorter timeframe, Park estimated that "[m]aybe 30 minutes" elapsed from the time Phan pushed Yim and the time he got into his car.

When Park got to the hospital he told highway patrol officers that he had been shot on the freeway because he assumed he was the only one hurt and he wanted to protect Yim. He later told police the truth, and testified that he would no longer lie to protect Yim because "[a] person's life was taken."

Park testified that due to his injury he lost feeling in three fingers, and movement and 50 to 60 percent of the muscle mass in his left hand.

*B. Other Prosecution Evidence*

. . .
Police found Phan's body in the house, and he had been dead for at least 12 hours. Phan was unarmed and holding a cell phone to his head. Crime scene technician Yager testified that four expended bullets and six expended rifle casings were recovered from the scene. A firearm and cartridge expert testified that the bullets and casings all came from the same AR–15 type firearm. An AR–15 is a semi-automatic rifle that can be converted to be fully automatic. Literature about converting an AR–15 to a fully automatic weapon was found in a backpack behind a couch.

Phan died from multiple gunshot wounds. A bullet grazed his right forearm and another went through the palm of his right hand. One bullet struck his left arm. A bullet entered his right front chest and another entered his left front abdomen. A bullet that entered his right ear would have been immediately fatal. The shot to Phan's head must have been the last one fired because hemorrhage around

3

the other wounds showed that he was alive when they were inflicted. Stippling showed that the head shot was fired from less than a foot away.

. . .

*C. Yim's Testimony*

Yim testified that he, Phan, and Park played video games, drank Hennessy, and used cocaine and marijuana on the night of April 1. Yim told Phan that he believed in god, and asked Phan about going to church. Phan disrespected him by saying he was acting like a girl when he asked about church. Phan disrespected him further by calling him a "bitch" and a "pussy" while they played video games. When Phan made a comment about Yim's father's death, Yim threw his cell phone through the TV screen. Phan and Park helped him clean up the mess, and he asked Phan to leave the house. Phan wanted to fight and taunted Yim saying, "'show me the wrath of God,'" and pushed him. He, not Phan, said "'I'm your ... friend.'" He again asked Phan to leave, but Phan said, "'I'm not leaving your house, so go get your gun.'"

When Phan said that, Yim was afraid because he thought Phan might have a gun. He knew Phan owned a pistol, and Phan was wearing baggy clothes. He immediately went and got his AR–15 rifle, which he kept in a closet in his bedroom at the back of the house. The rifle was a semi-automatic. He bought a kit to convert it to a fully automatic, but the conversion required modifications he was unable to perform. He bought the gun illegally from a friend and kept it for protection because he was selling marijuana at the house and feared a home invasion robbery.

Before he went to get the gun, he was sitting in a dining area next to the living room. He acknowledged that evidence technician Yager correctly measured the distance from the living room to the bedroom to be 21 to 24 feet. He cocked the gun in the bedroom so it would be ready to fire, and walked back to the living room where Phan was standing. He saw Phan reach into his pocket, pull out a black object he thought was a gun, and take a step toward him. He was frightened when Phan moved toward him, so he fired a shot at Phan intending to injure, not kill him. He did not remember firing any of the other shots. The next thing he remembered was the movement of a car outside. At that point he noticed that Phan was on the floor and Park had left.

California Court of Appeal Opinion filed in *People v. Yim*, No. C168147, 2016 WL 1735256, *1-5 (Cal. Ct. App. April 28, 2016).

4

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254 to impose new restrictions on federal habeas review. A petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411. "A federal habeas court making the 'unreasonable application' inquiry should ask whether the state

court's application of clearly established federal law was 'objectively unreasonable.'" *Id.* at 409.

The state-court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. *See Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091-92 (9th Cir. 2005). "When there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst*, 501 U.S. at 803. The presumption that a later summary denial rests on the same reasoning as the earlier reasoned decision is a rebuttable presumption and can be overcome by strong evidence. *Kernan v. Hinojosa*, 136 S. Ct. 1603, 1605-06 (2016). Although *Ylst* was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default and applies to decisions on the merits. *Barker*, 423 F.3d at 1092 n.3. In other words, when the last reasoned decision is a decision on the merits, the habeas court can look through later summary denials to apply § 2254(d) to the last reasoned decision.

## DISCUSSION

### I. Background

Yim contends that he received ineffective assistance of counsel because his trial counsel failed to object to the jury's viewing of prejudicial photographs and to the introduction of evidence that Yim had owned guns other than the AR–15 used to shoot Phan.

The photographs at issue were recovered from a safe in Yim's house. The photographs depicted mostly Asian males, some of whom were holding guns. At trial, the crime scene technician testified that the Asian males were flashing possible gang signs. Yim testified that the photographs were of his friends and that he was not depicted in any of the photographs. The photographs were shown to the jury but were not admitted into evidence.

With respect to the evidence of other guns, the crime scene technician testified that he found ammunition for a .357 gun in Yim's backpack and a box for nine millimeter ammunition in Yim's kitchen. Yim's cousin testified that she saw Yim with a handgun two years prior to the murder of Phan, and Yim told her he kept it to protect his music equipment. Yim testified that he sold the gun he showed his cousin, which was a .357 revolver, and testified that he had also

6

previously owned and sold a nine millimeter handgun.

Yim argued in his direct appeal (as he does here) that counsel's ineffectiveness in not objecting prejudiced him because there is a reasonable probability that the photographs and evidence of other guns affected the jury's verdict with regard to his self-defense, provocation, and intoxication defenses. Yim points to several reasons. First, he argues that one of the Asian males in the photographs looked like him, which may have caused the jury to speculate that Yim was one of the pictured gunmen. Yim argues that in light of other testimony about his prior involvement in a robbery, this likely caused the jury to infer that Yim was a member of a violent street gang. Additionally, Yim argues that the evidence that he illegally owned two other guns likely caused the jury to infer that he had committed a felony for which he had gone unpunished. Lastly, Yim contends that the prosecutor's evidence of premeditation and deliberation was extremely weak.

The California Court of Appeal rejected Yim's ineffective assistance of counsel claim, finding that counsel's failure to object was deficient, but there was no prejudice. That Court of Appeal correctly identified *Strickland v. Washington*, 466 U.S. 668, 687 (1984), as the governing standard and applied it. *Yim*, 2016 WL 1735256, at *5-6. In finding that Yim did not suffer prejudice, the California Court of Appeal explained:

> [T]here is no reasonable probability that counsel's ineffectiveness or the evidence in question affected the verdicts. The evidence was entirely tangential to the prosecution's case. It would not have been surprising or meaningful to the jury that Yim, who admitted being knowledgeable about guns, illegally possessed a semi-automatic assault rifle, and attempted to convert that rifle to a fully automatic weapon, owned two other handguns in the past. The photos were shown to the jury only in passing and were not ultimately admitted into evidence. Our review of the photos leads us to conclude it is most unlikely they would have left any indelible impression of Yim that would have caused the jury to convict him of crimes if they otherwise would not. It was unclear whether Yim was in any of the potentially incriminating photos, and whether any of them depicted gang activity. Neither the jury's viewing of the photos nor the admission of the other guns evidence undermines our confidence in the verdicts.

*Id.* at *6.

## II. Analysis

The Sixth Amendment's right to counsel guarantees not only assistance, but effective assistance, of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness is whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. *Id.* In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, a petitioner must establish two things. First, he must demonstrate that counsel's performance was deficient and fell below an "objective standard of reasonableness" under prevailing professional norms. *Id.* at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* The court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697.

A "doubly" deferential judicial review is appropriate in analyzing ineffective assistance of counsel claims under § 2254. *See Cullen v. Pinholster*, 563 U.S. 170, 202 (2011). When analyzing an ineffective assistance of counsel claim under § 2254, "[t]he pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A petitioner must "show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 103. Under this standard, "if the state court reasonably concluded that Petitioner failed to establish either prong of the Strickland test," then a federal court cannot grant relief. *Cannedy v. Adams*, 706 F.3d 1148, 1157 (9th Cir. 2013).

With regard to the evidence of other guns, the California Court of Appeal did not unreasonably apply *Strickland* in determining that Yim did not suffer prejudice from his trial counsel's performance. The unobjected-to evidence was that Yim possessed two other handguns

8

in addition to the semi-automatic firearm[2] he used to kill Phan. Had counsel objected and the evidence of the two other handguns been excluded, there was plenty of evidence presented to the jury that conveyed the impression that Yim was familiar with guns. That is, the jury still heard that: (a) Yim earlier had bought a kit to convert his semi-automatic firearm (used in the killing) into a fully automatic firearm; (b) Yim tried unsuccessfully to do the conversion; (c) Yim had literature in his backpack on how to convert an "AR-15 to an M16 rifle;" and (d) Yim had firearm parts in his backpack. RT 397, 400. Given this other evidence, which plainly suggested his familiarity with guns, the California Court of Appeal reasonably could conclude that there was no reasonable probability of a different outcome had counsel objected to admission of evidence about two handguns earlier possessed by Yim. Also, Yim's defenses did not depend on him being unfamiliar with guns.

With regard to the photographs, it was likewise not unreasonable for the Court of Appeal to determine that no prejudice resulted from counsel's failure to object to them. As the Court of Appeal noted, it was unclear whether Yim was in any of the photographs and whether they actually depicted gang activity. No one testified that Yim was in the photographs. The jury heard Yim testify that the photographs belonged to one of his friends and that Yim was not depicted in any of the photographs. RT 703. Additionally, the jury had very limited exposure to the photographs. The photographs were never admitted into evidence, and therefore, were not available during jury deliberations. The testimony by the criminal evidence technician about the photographs was also very brief, consisting of responses to only a few questions:

> Q: And what were the 29 photographs that you found photographs of?
>
> A: Typically they were photographs depicting male Asians and

---

[2] The record contains conflicting information as to whether the firearm used to kill Phan was a pistol or a rifle. The crime scene technician testified that the casings for rifle ammunition were generally larger than for pistol ammunition, and that he had recovered "rifle casings" that were "AR-15 or AK-47" style casings. RT 251-52. On the other hand, Yim testified that the weapon was an AR-15 pistol. RT 689, 724. He surreptitiously disposed of the gun during his post-crime trip to Los Angeles, and it was never recovered. RT 696. The California Court of Appeal referred to the weapon as a rifle. Whether it was a rifle or pistol does not change the analysis of the constitutional claim.

9

United States District Court
Northern District of California

|   |   |
|---|---|
| | generically he noted that several of the photographs had them holding guns, possible hand signs, gang signs. |
| Q. | Can you look at photograph 109, what is that a picture of? |
| A. | Hmm, these are -- this is a photograph of the photographs that I recovered from the safe. I took this photograph back in my office, again, so this would have been after I had recovered the items, transported them to my office and I laid them out to take more comprehensive photographs of them. |
| Q. | And looking at photograph 110, what is 110 a photograph of? |
| A. | Hmm, photograph 110 is a photograph of a newspaper clipping that I found inside the safe referencing teen sentence for murder. |
| Q. | What is photograph 111? |
| A. | Photograph 111 is a closer up photograph of several of the photographs I recovered from inside the safe. |
| Q. | Of the men holding weapons? |
| A. | Yes, and just the groups of predominantly male Asians. |

RT 402-403.

Viewing the record as a whole, there is not a reasonable probability of a different outcome had counsel objected and had the jury not seen the photographs or heard the testimony regarding Yim's other guns. Not only did the photographs and evidence of other guns not play a large role at trial, the case against Yim was strong, and his defenses of provocation, self-defense and intoxication were weak. Legally-adequate provocation (to reduce a killing to voluntary manslaughter) requires an average person in the same situation to react from passion, rather than judgment. *See* CT 283 (CALCRIM No. 570). Here, the only evidence of provocation presented to the jury was that Phan insulted Yim and gave him a push, which Park described as a "wake up push" to get Yim's attention. RT 154. Yim also had a weak case for imperfect self-defense. *See* CT 284 (CALCRIM 571) (imperfect self-defense applies when a defendant actually believes he or she is in imminent danger, and actually believes deadly force is necessary, but at least one of those beliefs is unreasonable). Both Yim and Park testified that the victim never threatened Yim. Yim also testified that he never saw the victim with a gun that night. Yim had cocked the gun

10

(readying it to fire) before he entered the room where he shot Phan and Park. And Yim fired five of the six shots into Phan's body after Phan had fallen to the ground, including the fatal shot to the head from less than a foot away. Additionally, Yim had left several voicemail messages within a day of the killing and did not mention that he acted in self-defense. Intoxication may be considered by a jury in assessing a defendant's mental state in a homicide, but not to determine whether a defendant's actions or beliefs were reasonable. *See* CT 289 (CALCRIM 625)[3]. Yim's defense of voluntary intoxication was weak due to inconsistencies in his testimony: at times he claimed to be too intoxicated to clearly remember the night, and at other times he claimed to remember specific details. *See* RT 733. At one point, he even testified that he remembered the events of the night better than Park did. *Id*. There also was testimony from an expert that, assuming Yim and the victim had consumed comparable amounts of alcohol and cocaine (which other testimony suggested had occurred), Yim would have been only mildly impaired. As the prosecutor also pointed out, Yim's physical movements, captured on a video surveillance recording, did not suggest impairment, and Yim was able to drive to Los Angeles after the killing without being stopped by police.

In an effort to show prejudice, Yim repeatedly points to the prosecutor's argument that the photographs and guns show that Yim "glorifies guns, glorifies murder." RT 846. Yim fails to note, however, that this statement was made *out of the presence of the jury* as the court was determining the admissibility of the evidence. The prosecutor did not make this argument to the jury. To the contrary, the prosecutor's closing argument (RT 884-957, 967-978) made no effort to paint Yim as a gangster or as glorifying guns. Instead, the prosecutor focused on the events at the house leading to the killing, and Yim's post-killing behavior, but none of that involved glorification of guns or gang connections. The prosecutor made only one fleeting mention of

---

[3] The jury instruction on voluntary intoxication provided, in part: "Voluntary intoxication may, under some circumstances, be considered in determining defendant's actual mental state, intent or knowledge. For example, you may consider whether defendant's purported state of intoxication caused him not to premeditate or deliberate a killing, not to harbor express malice (i.e., the intent to kill), to have been provoked . . . or caused him to actually believe in the need to defend himself or his home. [¶] However, voluntary intoxication may not be considered in determining whether a defendant's actions or beliefs were reasonable. That is to say, the reasonable person standard always presumes a sober person." CT 289 (CALCRIM 625).

11

Yim's prior gun ownership. RT 908 (prosecutor argues that Yim's cousin testified she had "seen the defendant with a gun before, not the AR-15 assault rifle, but another weapon"). But the prosecutor did not try to suggest that Yim was violence-prone with this evidence, nor did the prosecutor argue that he had any gang affiliation. The prosecutor did urge that Yim was familiar with guns, but this was more in the context of dispelling any idea that Yim was unaware of the danger his AR-15 firearm posed. RT 968 (prosecutor argues that Yim "knows guns, that they're deadly, that he knows a single shot can kill, and that he shot Mr. Phan anyways"). And the prosecutor argued that Yim wanted to convert his semi-automatic into a fully automatic firearm to make it into "a killing machine," RT 914-915, but Yim does not claim that counsel could have objected successfully to the evidence about the conversion of the firearm. In other words, even if counsel had objected successfully to the other guns evidence and the photographs, the evidence about his effort to convert his rifle (and argument about it) was properly before the jury.

Considering the strength of the overall case against Yim, and the peripheral nature of the evidence at issue, Yim fails to show that the California Court of Appeal's rejection of his claim of ineffective assistance of counsel was objectively unreasonable. Applying the "'highly deferential' look at counsel's performance . . . through § 2254(d)'s 'deferential lens,'" it cannot be said that the California Court of Appeal's rejection of Yim's claim was contrary to or an unreasonable application of *Strickland*. *See Cullen*, 563 U.S. at 202. The California Court of Appeal's analysis presents a "reasonable argument that counsel satisfied *Strickland*'s deferential standard," and that is sufficient to bar relief under § 2254(d). *See Harrington*, 562 U.S. at 105. Accordingly, Yim is not entitled to the writ on this claim.

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

**IT IS SO ORDERED**.

Dated: October 5, 2017

_____
SUSAN ILLSTON
United States District Judge

12